**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | | | |
|---|---|---|---|
| IN RE: | ) | CASE No. | 20-21444 (JJT) |
| | ) | | |
| CHRISTOPHER QUIROGA, | ) | CHAPTER | 7 |
| Debtor. | ) | | |
| | ) | | |
| BONNIE C. MANGAN, | ) | | |
| Chapter 7 Trustee, | ) | ADV. PRO. NO. | 22-02005 |
| Plaintiff | ) | | |
| V. | ) | RE: ECF Nos. | 11, 12, 19, 22 |
| | ) | | |
| SHAWN DAIGLE & 376 NM SOUTH, LLC | ) | | |
| Defendants. | ) | | |
| | ) | | |

**MEMORANDUM OF DECISION**
**ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I.    INTRODUCTION

On February 2, 2022, Bonnie Mangan, the Chapter 7 Trustee for the Debtor in the above-

captioned case, filed a seven count Adversarial Complaint against Shawn Daigle ("Daigle") and

376 NM South, LLC ("376 NM" and, together with Daigle, the "Defendants"), seeking to avoid

and recover one or more alleged fraudulent transfers of the Debtor's property made to or for the

benefit of the Defendants, and to collect damages for alleged violations of the automatic stay and

the *Barton* Doctrine. ECF No. 1, (the "Complaint"). Count I of the Complaint sounds in

Intentional Fraudulent Conveyance pursuant to 11 U.S.C. § 548(a)(1)(A); Count II sounds in

Constructive Fraudulent Conveyance under 11 U.S.C. § 548(a)(1)(B); Count III seeks to

invalidate the transfer from Daigle to 376 NM pursuant to 11 U.S.C. § 550(a)(2); Count IV seeks

recovery for Unjust Enrichment; and Count V seeks a turnover order for the Debtor's equitable

interest in the transfer as an asset of this bankruptcy estate pursuant to 11 U.S.C. § 542. The

Complaint also alleges violations of the automatic stay and the *Barton* Doctrine in Counts VI and VII, respectively.

The Defendants filed their Answer and Affirmative Defenses on March 7, 2022, (ECF No. 9), which was subsequently amended to assert a counterclaim for setoff and/or recoupment from any recovery that the Trustee may obtain in this proceeding. *See* ECF No. 10. Shortly thereafter, the Defendants filed a Motion for Summary Judgment as to Counts I–V of the Trustee's Complaint. ECF No. 11, ("Motion").[1] That Motion is now pending before the Court.

In their Motion, the Defendants argue that there are no genuine issues of material fact present, because the transfers that are the subject of the Trustee's Complaint were made for fair and adequate consideration. As such, the Defendants argue that they are entitled to summary judgment as a matter of law because the Trustee has not, and cannot, make a sufficient showing on an essential element of her case with respect to which she would have the burden of proof at trial.

The Trustee objected to the Motion, arguing that there are, indeed, several genuine issues of material facts in dispute, including whether the Debtor's property was transferred to Daigle with the actual intent to hinder, delay, and defraud creditors, and whether adequate consideration was given for the transfer of the Debtor's real property. ECF No. 12, (the "Objection"). The Trustee also assails the quality of the Defendants' evidence submitted in support of the Motion, including two supporting affidavits that the Trustee contends rely solely on inadmissible hearsay.

During a Pre-Trial Conference on April 7, 2022, the Court suspended the May 3, 2022 trial date held for the Trustee's Complaint, and in lieu thereof, indicated that it would instead hear oral argument on the Defendants' Motion and the Trustee's Objection thereto. *See* ECF No.

---

[1] Because the Motion only addresses Counts I-V of the Trustee's Complaint, the Court deems it a Motion for Partial Summary Judgment.

15. Thereafter, the Court entered a Scheduling Order on the Motion, reserving May 20, 2022 for oral argument, but directing that if neither party requested a hearing for argument, the Court would address the Motion on the papers. ECF No. 21. No such request was filed. Accordingly, the Court's decision herein is based upon a review of the Motion, the Objection, the docket, the parties' supporting Local Rule 56 Statements and related Responses, and all attachments thereto.

For the reasons set forth herein, the Court concludes that the evidence in this record demonstrates that there are triable issues of material fact in genuine dispute that preclude the entry of summary judgment on Counts I–V. Accordingly, the Defendants' Motion is hereby DENIED, and the Trustee's Objection is hereby SUSTAINED.

## II.    JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant proceeding under 28 U.S.C. § 1334(b), and the Bankruptcy Court derives its authority to hear and determine this matter on reference from the District Court under 28 U.S.C. §§ 157(a) and (b)(1) and the General Order of Reference of the United States District Court for the District of Connecticut dated September 21, 1984. This Adversary Proceeding constitutes a core proceeding under 28 U.S.C. §§ 157(b)(2)(H).

## III.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56, made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7056, directs that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is "material" if

it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In the Second Circuit, "only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

"The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact." *Boland v. Wilkins,* 2020 WL 4195740, at *1 (D. Conn. 2020) (citing *Celotex,* 477 U.S. at 323). "How the movant meets this burden and how the respondent may rebut the movant's showing is affected by the allocation of the evidentiary burden of persuasion if the dispute were to proceed to trial." *In re Polichuk,* 506 B.R. 405, 421 (Bankr. E.D. Pa. 2014). "[W]hen moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant can satisfy its burden of establishing that there is no genuine material fact in dispute by pointing to an absence of evidence to support an essential element of the non-moving party's claim." *Barry v. New Britain Bd of Educ.*, 2006 WL 3791388 at *2 (D. Conn. 2006) (citing *Celotex ,*477 U.S. at 322–23). "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on the plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Entm't, Inc.,* 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex*, 477 U.S. at 324).

Summary judgment must enter "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential

element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23.

"In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* The nonmoving party must therefore "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Id.*

When ruling on motions for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In making this assessment, "all reasonable inferences are to be drawn, and all ambiguities resolved, in favor of the non-moving party." *In re Bak*, 2013 WL 653073 at *3 (Bankr. D. Conn. 2013) (citations omitted).

IV.    THE UNDISPUTED FACTS

Local Rule 56(a)(1) of the Local Rules of Civil Procedure of the United States District Court for the District of Connecticut requires that a party moving for summary judgment file a Local Rule 56(a)(1) Statement of Undisputed Material Facts. D. Conn. L. R. 56(a)(1). Local Rule 56(a)(2) requires that a party opposing a motion for summary judgment file a Local Rule 52(a)(2) Statement of Facts in Opposition to Summary Judgment. D. Conn. L. R. 56(a)(2). Each material fact set forth in a movant's statement and supported by the evidence "will be deemed to be admitted (solely for the purposes of the motion) unless such fact is controverted by the Local Rule 56(a)(2) Statement required to be filed and served by the opposing party in accordance with

this Local Rule . . ." *See* D. Conn. L. R. 56(a)(1); *see also Parris v. Delaney (In re Delaney)*, 504 B.R. 738, 746–47 (Bankr. D. Conn. 2014).

Based upon a review of the parties' summary judgment submissions, in addition to the relevant pleadings in this Adversary Proceeding and the main bankruptcy case, and this Court's independent examination of those records, the Court finds the following material facts to which there is no genuine dispute:

1.  The Defendant, Shawn Daigle ("Daigle"), is an individual residing in Glastonbury, Connecticut.

2.  376 NM South, LLC is a Connecticut Limited Liability Company.

3.  Daigle is the sole member of 376 NM South, LLC.

4.  Prior to May 24, 2019, Christopher Quiroga ("Debtor" or "Quiroga") owned property located at 376 North Main Street, Southington, Connecticut (the "Property").

5.  On January 14, 2019, Iolanda and Maurizio Marcuccio filed a Complaint in the Superior Court for the Judicial District of New Haven, Docket No. CV19-5024750-S, known as *Iolanda Marcuccio and Maurizio Marcuccio v. Christopher Quiroga* (the "State Court Complaint").

6.  The Debtor was self-represented throughout those proceedings.[2]

7.  On April 2, 2019, Iolanda and Maurizio filed a Motion for Default in the State Court Case, and three days later the Debtor filed an Answer denying the Marcuccios' allegations but requesting more time to file Special Defenses.

8.  On May 7, 2019, the Marcuccios filed a Certificate of Closed Pleadings and claimed the State Court Complaint to the trial list.

---

[2] The Docket in the State Court Case reflects that on July 24, 2019, a Limited Appearance was entered on behalf of the Debtor.

9.   On or about May 24, 2019, the Debtor transferred the Property to Daigle (the "Transfer") via a quit-claim deed, which deed was filed in Volume 1450 at page 561 of the Town of Southington land records.

10. The Transfer Agreement and other closing documents evidence that the Property was encumbered by a debt totaling $163,501.76, made up of the following:

      a.   Town of Southington Water & Sewer: $3,863.72

      b.   Town of Southington Outstanding Property Tax: $24,614.76

      c.   Mortgages in favor of Renaldo and Sylvia Riccitelli: $122,211.31

      d.   Connecticut DRS Tax Lien: $10,111.97

      e.   Judgment lien in favor of Stacy Vale: $2,700.00.

11. The Transfer was made within two (2) years of the Petition Date.

12. On September 22, 2020, the Superior Court awarded Iolanda Marcuccio judgment in the amount of $156,326.87 and Maurizio Marcuccio judgment in the amount of $21,719.62.

13. The Judgement indicated that the Debtor did not appear at the trial. A default was entered against the Debtor and the case proceeded to a hearing in damages.

14. The Judgment has not been stayed nor appealed.

15. The Debtor filed for Chapter 7 bankruptcy protection on December 23, 2020.

16. The Plaintiff, Bonnie Mangan ("Trustee"), was appointed Trustee for the Debtor's bankruptcy case.

17. Iolanda Marcuccio filed a Proof of Claim in the Debtor's bankruptcy case in the amount of $156,326.87 (Claim No. 2).

18. Maurizio Marcuccio filed a Proof of Claim in the Debtor's bankruptcy case in the amount of $21,719.62 (Claim No. 3).

19. In his Petition, the Debtor indicated that his assets totaled $11,229.00, of which $10,000 was attributed to "potential recovery in a [Chapter] 11 case" and $529.00 was attributed to a "possible" federal tax refund. The Debtor listed his total liabilities as $332,437.31.

20. In his Schedules, filed on January 6, 2021, the Debtor listed in response to the Statement of Financial Affairs ("SOFA") question 18 that he transferred the Property to Daigle on May 24, 2019.

21. In his Schedules, filed on January 6, 2021, the Debtor listed in response to SOFA question 18 that "[i]n exchange for the deed to [the Property], Shawn Daigle was supposed to pay off water and sewer bill to Town of Southington $3,863.72, property taxes to Town of Southington $24,614.76, Riccitelli mortgages $122,211.31, DRS tax lien $10,111.97, credit $161,546.24 to debt of $475,000.00 owed by Christopher Quiroga to Shawn Daigle, and a judgment lien in favor of Stacy Vale of $2,700.00."

22. The Debtor's Schedules listed Renaldo Riccitelli as a nonpriority unsecured creditor with a claim in the amount of $122,211.31.

23. When asked in his Petition whether he "receive[d] any other income during [that] year or the two previous calendar years," the Debtor responded, "no."

24. The Debtor's bankruptcy schedules were signed under penalty of perjury and subjected him to possible prosecution for bankruptcy fraud were the information in them not true and accurate.

25. 376 NM South, LLC became owner of the Property on or about October 7, 2021, via a quit-claim deed from Daigle filed on October 15, 2021, in Volume 1542 at Page 323 of the Town of Southington land records.

26. 376 NM admits that it did not pay for the transfer from Daigle.

27. 376 NM is an immediate or mediate transferee of Daigle.

28. The Trustee filed an "Affidavit of Facts Relating to Title or Interest in Real Estate" on October 14, 2021, in Volume 1542 at Page 174 of the Southington land records ("Affidavit").

29. In her Affidavit, the Trustee claimed, *inter alia*, that "[b]ased upon information and belief, the bankruptcy estate [of Quiroga] may have an equitable interest" in the Property.

30. In the Debtor's main bankruptcy case, the Defendants filed a Motion to Compel Abandonment on January 19, 2022 (ECF No. 51), indicating that Daigle "entered into a contract for sale of the [P]roperty" but that "the buyer refuses to proceed [with the sale] due to the" claim alleging an equitable interest in the Property asserted in the Trustee's Affidavit. That Motion sought to compel the Trustee to abandon her alleged claim against the Defendants, or to immediately commence an Adversary Proceeding to assert any such claim.

31. The Trustee objected to the Motion to Compel (ECF No. 56), asserting that she "has a valuable fraudulent conveyance claim pursuant to 11 U.S.C. § 548(a) concerning the Property" that is not of inconsequential value to the estate.

32. At a hearing before this Court on the Motion to Compel and the Trustee's Objection thereto, the parties reached an agreement in principle whereby the sale of the Property could proceed, certain ordinary and customary expenses related thereto could be paid from the sale proceeds, $138,590.45 could be disbursed to the Defendants, and the remainder of the proceeds would be placed into an escrow account pending a final resolution of the parties' dispute regarding the proper ownership of the escrowed funds. That agreement was thereafter memorialized as the Escrow Agreement filed on the docket at ECF No. 65.[3]

---

[3] This Court's final disposition of this Adversary Proceeding will determine whether the Trustee or the Defendants are entitled to the escrowed funds.

V.    DISCUSSION

A.  Count I – Intentional Fraudulent Conveyance

In Count I of the Complaint, the Trustee alleges that the Transfer to Daigle was made with the actual intent to hinder, delay, and defraud the Debtor's existing creditors, and specifically the Marcuccios, who were aggressively pursuing him in state court at the time of the Transfer. In the Answer, Daigle admits to receiving the Transfer, but otherwise denies the remainder of the Trustee's allegations, including that the Property was the Debtor's most valuable asset, that Daigle and the Debtor were close business associates, and that the Transfer rendered the Debtor insolvent.

In their Motion, the Defendants argue that the Trustee has no actual evidence to support her claim, and that her

> unsupported allegations are irrelevant unless the Trustee can establish that the Property was not transferred for fair and adequate consideration. Absent that, [the Transfer] was merely a sale of property of the Debtor that in no way negatively affected his financial condition as the Property was sold to pay off valid creditors.

The Trustee, in turn, argues that the Defendants have provided no supporting documentation, only bare argument, to establish that there are no genuine issues of fact that the Debtor did not transfer the Property with the actual intent to hinder, delay and defraud creditors, and that she has nonetheless provided sufficient evidence supporting various badges of fraud, to create a genuine issue for trial.

Although the Defendants urge that summary judgment as to Count I is warranted based upon the Trustee's alleged failure to prove the "critical lynchpin to the entire case [which] is the claim that the debtor's transfer of the subject real estate was for less than reasonably equivalent value," in seeking to set aside the Transfer as an intentional fraudulent conveyance under the

Code, the Trustee "is relieved from the need to establish two of the most important factors in a case involving constructive fraudulent transfers, insolvency of the transferor and inadequacy of consideration (*or lack of reasonably equivalent value*)." *In re MarketXT Holdings Corp.*, 376 B.R. 390, 402–03 (Bankr. S.D.N.Y. 2007) (collecting cases) (emphasis added). Rather, as to Count I, the Trustee must prove three elements to establish an actual fraudulent conveyance under Section 548(a)(1)(A): (i) a transfer of an interest of the debtor in property; (ii) made within two years of the petition date; (iii) with "actual intent to hinder, delay, or defraud" a creditor. *In re Goldberg*, 623 B.R. 225, 236 (Bankr. D. Conn. 2020) (citations omitted).

The Defendants, however, may be able to defeat the Trustee's claim if they can establish that they gave value in exchange for the Transfer and that they took in good faith. Under 11 U.S.C. § 548(c), a transferee "that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation." The Defendants' "'good faith' and value given 'in exchange' is an affirmative defense under § 548(c) that the transferee must plead and prove." *MarketXT Holdings*, 376 B.R. at 403 (citations omitted). In the Amended Answer (ECF No. 10), the Defendants raised this affirmative defense, stating that the "Defendants acquired the property and other assets in good faith and for reasonably equivalent value and are therefore entitled to the protections Conn. Gen. Stat. § 52-552(l) et seq. and 11 U.S.C. § 548(c)."

At trial, the Trustee would bear "the burden of proof as the party alleging a fraudulent transfer or conveyance and must prove the elements by clear and convincing evidence." *In re Neri Bros. Construction Corp.*, 593 B.R. 100, 141 (Bankr. D. Conn. 2018) (citations omitted). Because of the difficulty in proving actual intent to hinder, delay, or defraud in making its case, a

party can rely on the "badges of fraud," which are "circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005) (citation and internal quotation marks omitted). Since direct evidence of fraudulent intent is rare, "courts infer fraudulent intent by examining the circumstances surrounding the transfer to determine whether any 'badges of fraud' are present." *In re Colonial Realty Co.*, 226 B.R. 513, 522 (Bankr. D. Conn. 1998).

This Court has previously identified various examples of badges of fraud, including: (1) concealing facts and false pretenses; (2) an unconscionable discrepancy in consideration received in exchange for the value of the property transferred; (3) creating a closely-held corporation for property receipt; (4) closeness in relationship between the parties; (5) retaining the property in question for benefit or use; (6) the financial condition of the transferor and transferee both before and after the transfer(s); (7) repeated patterns or cumulative effect of courses of conduct post-insolvency or financial troubles; and (8) the timeline of events. *In re Jie Xiao*, 608 B.R. 126, 157 (Bankr. D. Conn. 2019).

In addition to the aforementioned badges of fraud, in determining actual fraudulent intent, courts may also consider additional factors, including whether: (1) the transfer or obligation was to an insider; (2) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (3) the transfer was of substantially all the debtor's assets; (4) the debtor absconded; (5) the debtor removed or concealed assets; (6) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (7) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (8) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an

insider of the debtor. *Neri Bros.*, 593 B.R. at 149 (citing *The Cadle Co. v. White*, 2006 WL 798900, at *7 (D. Conn. Mar. 21, 2006)).

One badge of fraud can "spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud." *Colonial Realty*, 226 B.R. at 522 (citation omitted). "[E]ach alleged 'badge of fraud' must be judged in the context of other evidence and in light of what reasonable implications can be drawn from it in a particular case." *In re Direct Access Partners, LLC,* 602 B.R. 495, 544 (Bankr. S.D.N.Y. 2019). Further, the actual intent to defraud "need not target any particular entity or individual as long as the intent is generally directed toward present or future creditors of the debtor." *In re Bayou Grp., LLC*, 439 B.R. 284, 304 (S.D.N.Y. 2010). Simply put, "the debtor must have had an intent to interfere with creditors' normal collection processes or with other affiliated creditor rights for personal or malign ends." *In re Lehman Bros. Holdings, Inc.*, 541 B.R. 551, 575 (S.D.N.Y. 2015) (internal citation and quotations omitted).

Here, it is undisputed that the Transfer involved Property in which the Debtor had an interest and that the Transfer was made within two years of the Petition Date. In order to establish a claim for actual fraudulent conveyance, the Trustee must therefore prove, through evidence supporting the presence of various badges of fraud, that the Debtor's Transfer of Property was intended to hinder, delay, or defraud a creditor. The record here establishes that Trustee has presented to the Court sufficient evidence supporting the existence of various badges of fraud indicative of an actual intent to hinder, delay, or defraud that creates a genuine issue of material fact to be decided at trial.

The Trustee argues that there are sufficient badges of fraud present from which the Court may infer the requisite intent, demonstrating the existence of a genuine issue of material fact that

would preclude the entry of summary judgment. Specifically, the Trustee relies on the following probative facts and circumstances: the timing of the Transfer with respect to the status of the State Court Case; the large judgment awarded against the Debtor in the State Court Case and the two judgment creditors that remain unpaid; that the Debtor would have likely lost the Property as a result of that judgment had the Transfer not been made; the timing surrounding the entry of the State Court judgment against the Debtor and the Debtor's subsequent filing of a bankruptcy petition; that the Property was the Debtor's most valuable asset; that the Transfer rendered the Debtor insolvent; that the Transfer was made to a non-statutory insider; that there was a lack of consideration given in exchange for the Transfer; and that Daigle did not record the release of liens on the Property until years after the Transfer and only right before the Property was sold. The record here demonstrates that most, but not all, of the aforementioned badges of fraud are present in connection with this Motion.

  *1. The Timing of the Transfer – the State Court Case*

  The Trustee contends that "the Debtor transferred his Property to Daigle to shield this asset from creditors he defrauded several years earlier who were aggressively pursuing him at the time of the Transfer." In support of this contention, the Trustee underscores that the Transfer took place approximately four (4) months after two creditors of the Debtor's estate, Iolanda and Maurizio Marcuccio (the "Marcuccios"), filed the State Court Complaint against the Debtor, whereby they alleged claims for breach of contract, unjust enrichment, and fraud. In response, the Defendants acknowledge that, before the Transfer was made the Debtor had been sued, but otherwise seek to diminish the relevance of this fact by then stating that "judgment did not enter against the Debtor for over a year after the transfer to Daigle."

The record shows that the State Court Complaint was filed on January 14, 2019, and that the Debtor was self-represented during these proceedings.[4] On April 2, 2019, the Marcuccios filed a Motion for Default against the Debtor for his failure to plead, and on April 5, the Debtor filed an Answer and a Motion for Extension of Time to File Special Defenses.

Critically, however, on May 7, 2019, the pleadings in the State Court Case closed. Just over two weeks later, on May 24, 2019, the Debtor transferred the Property to Daigle. The Trustee contends that these facts and circumstances demonstrate that the Transfer was made "at a time when [the Debtor] believed that these creditors were close to getting judgment." In construing these facts in the light most favorable to the Trustee, the Court agrees.

The Defendants have simply failed to rebut this argument, and these facts are not reasonably disputed. Thus, in the absence of controverting evidence from the Defendants, the evidence in this record definitively supports the conclusion that this badge of fraud presents a genuine issue of material fact to be decided at trial.

2. *Whether the Transfer occurred shortly before a large debt was incurred – Judgment in the State Court Case*

In support of this particular badge of fraud, the Trustee underscores that the State Court Case ultimately went to trial, and on September 22, 2020, the Marcuccios each received substantial judgments which remain unpaid to this day. Specifically, Iolanda Marcuccio was awarded a judgment against the Debtor in the amount of $156,326.87, and Maurizio Marcuccio was awarded a judgment against the Debtor in the amount of $21,719.62. Interest has been accruing on each judgment at the rate of 10% per year. The Judgment After Trial entered in the State Court Case, which the Trustee included in her summary judgment record, indicates that the

---

[4] The State Court docket reflects that on July 24, 2019, a limited appearance was filed on behalf of the Debtor.

Debtor did not appear at the scheduled trial, and as a result, a default was entered against the Debtor and the case proceeded to a hearing in damages.

The Defendants, in turn, argue that the Transfer did not occur shortly before a substantial debt was incurred because "the [T]ransfer of title was a year and a half prior to the entry of the Marcuccios' judgment against the Debtor." Although the Defendants' computation of time is not disputed, the record indicates that after the pleadings were closed and a Scheduling Order was entered in the State Court Case on October 31, 2019 (which ostensibly set a trial date), the Debtor thereafter filed a Caseflow Request on December 19, 2019, and three subsequent Motions for Continuance on January 29, 2020, March 2, 2020, and June 10, 2020. When drawing all reasonable inferences in favor of the Trustee, as this Court must do on Summary Judgment, the evidence supports the conclusion that the "year and a half" delay between the Transfer and the State Court Judgment was a direct result of the actions taken by the Debtor in that case.

The Trustee has provided sufficient evidence to support the contention that the Transfer took place shortly before a large debt was incurred and to present a genuine issue of material fact for trial.

*3. Whether the Debtor was insolvent at the time of the Transfer*

The Debtor's insolvency at the time of the Transfer is also an essential element of the Trustee's constructive fraudulent transfer claim, which the Court will discuss further below. Consistent, however, with the Court's conclusions as to Count II of the Trustee's Complaint, the Defendants have failed to satisfy their burden on summary judgment and establish that there is no genuine dispute as to the Debtor's solvency by pointing to an absence of evidence on the Trustee's part. At this juncture, the record contains insufficient evidence to support the

conclusion that the Debtor was insolvent at the time of the Transfer. The Debtor's solvency, or

lack thereof, at the time of the Transfer remains a material triable issue.

### 4. The closeness in relationship between the parties – Daigle was a non-statutory insider

The Trustee contends that Daigle was a non-statutory insider based upon, among other

things, the hundreds of thousands of dollars that Daigle alleges to have loaned to the Debtor.

Daigle denies that he was an insider, arguing that he "is not a relative, a partner with, nor a

business owner with the Debtor," but nonetheless admits that he "had various business dealings

with the debtor dating back years in which [Daigle] loaned [the Debtor] money, paid off a

number of his debts and transferred other viable items to him. . . . [including] two BMW's and

two Chevrolet Denali's." Daigle's Affidavit further states that he "loaned [the Debtor] money to

assist his business known as Renaldo's Restaurant in the Queen Bee Plaza in Southington."

The Bankruptcy Code contains a non-exhaustive list of *per se* insiders, which includes

relatives and business partners of the debtor. *See* 11 U.S.C. § 101(31). Given that the Code's list

is non-exhaustive, "courts have devised tests for identifying other, so-called 'non-statutory'

insiders." *U.S. Bank Nat. Ass'n v. Village at Lakeridge, LLC*, 138 S.Ct. 960, 963 (2018). In

determining whether an individual is a non-statutory insider, courts look to: "(1) the closeness of

the relationship between the debtor and the transferee, and (2) whether the transactions between

the transferee and the debtor were conducted at arm's length." *In re Tarricone, Inc.*, 286 B.R.

256, 262 (Bankr. S.D.N.Y. 2002).

The inquiry into whether one is an insider is fact intensive and can turn on a case-by-case

basis. *Id*. The court in *In re Emerson*, 235 B.R. 702, 707 (Bankr. D. N.H. 1999), compiled a non-

exhaustive list of factual elements that courts have considered when determining whether a

transferee is an insider, including: whether the loan made to the debtor was documented; whether

17

the loans were made on an unsecured basis and without inquiring into the debtor's ability to repay the loans; whether the transferee knew that the debtor was insolvent at the time the loans were made; whether there were numerous loans between the parties; whether there were any strings attached as to how the debtor could use loan proceeds; whether the loans were commercially motivated; whether the transferee had an ability to control or influence the debtor; whether there was a personal, business, or professional relationship between the parties allowing the transferee to gain an advantage such as that attributable simply to affinity; whether the transferee had authority to make business decisions for the debtor; whether there is evidence of a desire to treat the transferee differently from all other general unsecured creditors; and whether there was an agreement among the parties to share profits and losses from business transactions.

In her Objection to the Motion, the Trustee contends that "it is outside the realm of reasonableness for Daigle to lend the Debtor hundreds of thousands of dollars, as he alleges, and there not be some type of insider relationship between Daigle and the Debtor." The evidence before the Court, and critically, Daigle's affidavit, supports the conclusion that Daigle was an insider of the Debtor at the time of the Transfer.

Here, Daigle admits to having a business relationship with the Debtor "dating back years," to have "paid bills for the [Debtor's] business to keep it open including $50,000 in back rent," to have "paid back taxes, including state sales tax on those businesses, [and also] paid for two walk-in coolers, a refrigerator, pools, chairs and other equipment as well." Daigle further admits to transferring "numerous vehicles" to the Debtor, "including two BMWs and two Chevrolet Denali's."  Notwithstanding these multiple and significant transfers, allegedly totaling in excess of $475,000, Daigle claims that he has no documentation evidencing or demonstrating any transfer of monies, real property and personal property from him to the Debtor. Aside from

claiming that he is not a "relative, a partner with, nor a business owner with the Debtor," Daigle does not otherwise refute the closeness in relationship with the Debtor. In fact, it cannot be reasonably disputed that the Debtor and Daigle had a close relationship.

As to the nature of the transaction, the Supreme Court has underscored that the "widely . . . understood definition of an arm's length transaction [is] a transaction conducted as though the two parties were strangers." *Village at Lakeridge*, 138 S.Ct. at 967–68; *see also In re Bayonne Medical Center,* 429 B.R. 152, 185–86 (Bankr. D. N.J. 2010) ("An arm's length transaction . . . is commonly described as being 'in the ordinary course of business by parties with independent interests.'").  In addition to demonstrating a closeness in relationship between the Debtor and Daigle, the evidence in this record also supports the conclusion that the transactions were not made at arm's length.

The general lack of formality surrounding the various transactions evidenced, in part, by the complete lack of documentation demonstrating amounts advanced, the dates of any transfers from Daigle to the Debtor, or terms of repayment, demonstrates that they could not have been undertaken as part of the "ordinary course of business."[5] The evidence also demonstrates that these transactions were not conducted by "strangers" with "independent interests." Daigle's Affidavit sets forth that he "loaned [the Debtor] money to assist his business," which Daigle claims the Debtor was mismanaging.[6] After the Debtor was evicted from the business premises

---

[5] In determining whether transactions are made, or debt is incurred, in the ordinary course, courts generally consider "whether or not the debt was incurred in a typical, arms-length commercial transaction that occurred in the market place, or whether it was incurred as an insider arrangement with a closely-held entity." *In re Save Home Energy, Inc.,*567 B.R. 1, 13 (Bankr. D. Conn. 2017) (citations omitted).

[6] In support of the Motion, the Defendants also submitted the Affidavit of Kyle Guilfoyle, a Branch Manager at Liberty Bank allegedly familiar with the financials of the Debtor's business, Renaldo's restaurant. The statements of Mr. Guilfoyle further support the conclusion that the various transactions were not made at arm's length. In his Affidavit Mr. Guilfoyle states:

> Mr. Daigle loaned [the Debtor] money to support the Renaldo's restaurant operation on many occasions. The funds were used to pay for all the machinery

for failing to pay rent, however, Daigle "wanted to continue operating [the business] in order to recoup [his] loans" and did so by paying back rent of $50,000, obtaining a new lease, and re-opening the business.

The evidence before the Court definitively supports the conclusion that the transactions between Daigle and the Debtor were not made at arm's length. Daigle further cannot dispute that his interests were independent of the Debtor's, when Daigle allegedly advanced significant funds to assist the Debtor and his business—while admittedly knowing that the Debtor was unable to pay both his rent and his employees' wages—to then "loan" even more money to try and turn the business around in order to "recoup" monies previously advanced. The evidence contained in this summary judgment record, when viewed in the light most favorable to the Trustee, supports the conclusion that there is a genuine issue of material fact for trial as to whether Daigle was an insider of the Debtor at the time of the Transfer.

    *5.  Whether the Property was the Debtor's most valuable asset*

At the time of the Transfer, the Debtor and Daigle agreed upon a value for the Property of $325,000. The record contains no evidence of the fair market value of the Property at the time of the Transfer, and the Trustee has not advanced a contrary valuation, but she nonetheless urges that the Property was the Debtor's most valuable asset. The Defendants dispute this claim, arguing that, at a minimum, "the Debtor possessed $518,875.64 within two years prior to his bankruptcy filing." Notwithstanding the Defendants' contention that the Debtor allegedly had additional assets in excess of the substantial value of the Property, the Trustee has not presented

---

and equipment in the restaurant, large sums were loaned to pay employees for back wages that had not been paid and for other cash shortages at the restaurant. I also witnessed Mr. Daigle depositing cash and other checks at my bank branch which went into the [Renaldo's] bank account for restaurant operations and wages and I also witnessed Mr. Daigle providing money to [the Debtor] for the restaurant.

any substantiated evidence at this juncture to establish that the Property was the Debtor's most valuable asset.

As discussed further herein, however, the Debtor's insolvency, which necessarily implicates the amount and valuation of his assets (including the Property) and liabilities, remains a triable issue that the parties will be able to further develop and argue at a trial on the Trustee's Complaint.

   6.   *Whether there was an inadequacy of consideration given in exchange for the Transfer*

It is not in dispute that the Debtor and Daigle valued the Property at $325,000, which represents merely an agreed-upon value that is not otherwise supported by any evidence of the fair market value of the Property at the time of the Transfer. In exchange for the Transfer, the Defendants allege that Daigle provided consideration in the amount of $163,501.76, that was put toward outstanding tax and mortgage obligations on the Property. In support of this alleged consideration, the Defendants provided checks[7] demonstrating payments made to the Southington Sewer Department in the amount of $2,912.73; the Southington Water Department for $950.99; the Connecticut Department of Revenue Services in the amount of $10,111.97; and the Southington Tax Department for $24,614.76. These four checks were dated May 24, 2019 (the date of the Transfer) and total $38,590.45.

Additionally, a portion of the alleged consideration consisted of the payment of a mortgage on the Property held by Renaldo and Sylvia Riccitelli in the amount of $122,211.31. This payment was not made on the date of the Transfer, however, and was subsequently reduced to $100,000 through settlement. The check provided by the Defendants demonstrating payment

---

[7] As will be discussed further herein, there is a genuine dispute as to the source of these funds.

for this mortgage is dated June 15, 2020—more than one year after the Transfer. Including this post-Transfer payment, the alleged consideration for the Transfer totals $138,590.45.

Daigle asserts that he was owed more than $475,000 by the Debtor, and that in addition to the $38,590.45 allegedly paid on the date of the Transfer, and the $100,000 paid more than a year later, Daigle also credited the Debtor with a $161,546.24 payment toward the Transfer—a number arrived upon by deducting the (unadjusted) $163,501.76 in alleged consideration paid by Daigle from the agreed-upon value of the Property.[8] Daigle asserts that he took the $325,000 Property "in full satisfaction of everything owed to [him] by the debtor."

The Trustee contends, and the evidence in the record supports the conclusion, that the Debtor received from Daigle a fraction of what the Property was valued at for the Transfer— either $38,590.45 at the time of the Transfer, or $138,590.45 more than a year later. The record is conflicting, however, as to whether the Debtor received additional value, above and beyond this alleged consideration, in the form of the satisfaction of an antecedent debt.

For purposes of Section 548, value is defined as "property, or satisfaction or securing of a present or antecedent debtor of the debtor, but does not include an unperformed promise to furnish support to the debtor . . ." 11 U.S.C. §548(d)(2)(A). "The initial determination of whether the debtor received any value is typically easy and resolved by applying section 548(d)'s definition. . . . [setting forth] that transactions that satisfy, discharge or secure all or part of an otherwise *legitimate* obligation are for 'value.'" 5 Collier on Bankruptcy, ¶ 548.05[2][b] (2022) (emphasis added).

---

[8] When deducting the unadjusted alleged consideration of $163,501.76 from the $325,000 agreed-upon value of the Property, the remaining "credited balance" should actually be $161,498.24. As noted, however, any alleged consideration ultimately totaled $138,590.45 after the reduction of the Riccitelli mortgages.

The Trustee asserts that there is a genuine issue of material fact as to the legitimacy and validity of Daigle's alleged $475,000 debt. She argues that, despite Daigle's representation that the consideration for the Transfer was primarily a large outstanding debt in excess of $475,000, "Daigle has been unable to produce a bank statement, a cancelled check, a promissory note, a wire transfer receipt, and correspondence or any other documents demonstrating that any money was owed to him by the Debtor." In support of this argument, the Trustee has provided Daigle's responses to her First Set of Interrogatories, wherein Daigle answered "none" in response to the Trustee's request for any "documents evidencing or demonstrating any transfer of monies, real property, and all personal property from [Daigle] to the Debtor."

As to the validity of Daigle's debt, the Defendants argue that "the Debtor's own sworn bankruptcy schedules . . . admits the existence of the large debt to Daigle." The Debtor's Schedules, filed a year and a half after the Transfer, and after Daigle allegedly provided consideration, specifically state that

> In exchange for the deed to [the Property], Shawn Daigle *was supposed to pay off* water and sewer bill to Town of Southington $3863.72, property taxes to town of Southington $24,614.76, Riccitelli mortgages $122,211.31, DRS tax lien $10,111.97, credit $161,546.24 to debt of $475,000.00 owed by [the Debtor] to Shawn Daigle, and a judgment lien in favor of Stacy Vale of $2700.00.

(emphasis added). The Defendants also submitted an undated agreement, signed only by the Debtor and Daigle, and not otherwise acknowledged by a notary public or witness, that states the Debtor "is indebted to Daigle in an amount in excess of Four Hundred Seventy-Five Thousand and 00/100 ($475,000) Dollars." Much like the parties' agreed-upon value for the Property, this recital of alleged indebtedness is no more than an unsubstantiated agreed-upon number that just as well may have been plucked out of thin air. On summary judgment, without any independent corroborating documents, and drawing all reasonable inferences in the favor of

the Trustee, the Court is not persuaded that the debt instrument reliably speaks for itself. The affidavits the Defendants filed in support of the Motion further fail to bolster the alleged validity of the antecedent debt.

There is no evidence in the Defendants' supporting affidavits that corroborates the amount or validity of Daigle's alleged debt. Rather, to use the Defendants' terms, the affidavits merely rely on surmise and innuendo, alleging that the Debtor expressed to/informed the affiants that he "owed substantial sums of money to Shawn Daigle"; "owed Shawn Daigle significant sums of money in the hundreds of thousands"; "owed very large sums of money to Shawn Daigle"; and "owed hundreds and hundreds of thousands of dollars to Sean [sic] Daigle." In fact, Mr. Daigle's affidavit does not even acknowledge the amount of the alleged debt owed him, but instead states that the Debtor "acknowledged many times to me that he owed me hundreds of thousands of dollars." These conclusory statements do not credibly establish or substantiate the validity and amount of the alleged debt.

Given the evidence before the Court, and construing it in the light most favorable to the Trustee, the record demonstrates that there was consideration provided to the Debtor in the amount of $138,590.45 in exchange for the Property valued at $325,000. The record evidence further demonstrates that there is a triable issue as to the validity and amount of Daigle's antecedent debt, which may or may not constitute additional consideration given in exchange for the Transfer.

"The determination of whether reasonably equivalent value was received by the debtor requires the court to compare what was given with what was received." *In re Guerrera,* 225 B.R. 32, 36 (Bankr. D. Conn. 1998) (citations omitted). Whether this Court looks to the consideration given at the time of the Transfer, ($38,590.45, representing 11.87% of the value of the Property),

24

or consideration as of June 15, 2020 ($138,590.45, representing 42.64% of the value of the Property), the Court determines that, at either date, the evidence currently in the record supports the conclusions that there was inadequate consideration given in exchange for the Transfer.[9]

Based on the foregoing, and in the context of all of the evidence construed in the light most favorable to the Trustee, the Court has determined that the record demonstrates the presence of several badges of fraud that support the Trustee's conclusion that the Transfer was made with the actual intent to hinder, delay, or defraud the Debtor's creditors, such that there remains a triable issue as to Count I of the Trustee's Complaint. Notwithstanding this conclusion, the Defendants contend that because the Transfer was made for reasonably equivalent value, the Trustee's claim for intentional fraudulent conveyance must fail.

As previously discussed, the Defendants may be able to defeat the Trustee's claim if they can establish that they gave value in exchange for the Transfer and that they took in good faith. Daigle, as the transferee, bears the burden of proving the elements of value given and taking in good faith. *In re Bayou Group, LLC*, 439 B.R. 284, 308–09 (Bankr. S.D.N.Y. 2010).[10]

As a threshold matter, Section 548(c), by its clear and unambiguous terms, requires that, in order to avail itself of this affirmative defense, it is the *transferee* who must give value to the debtor. *See* 11 U.S.C. § 548 (c) ("A transferee . . . of such a transfer . . . that takes for value and in good faith has a lien on or may retain any interest transferred . . . to the extent that *such transferee . . . gave value to the debtor* in exchange for such transfer . . . .").

---

[9] Although reasonably equivalent value does not require "mathematical precision" or a "penny-for-penny" exchange, "the court must keep the equitable purposes of the statute firmly in mind, recognizing that any significant disparity between the value received and the obligation assumed . . . will have significantly harmed . . . innocent creditors. . . . " *In re Guerrera*, 225 B.R. at 36 (citations omitted).

[10] 376 NM, as an immediate or mediate transferee of Daigle, admits that it did not pay for the transfer.

In her Affidavit in Opposition to the Motion, the Trustee contends that, with respect to the checks produced by the Defendants alleging to demonstrate consideration in exchange for the Transfer, that "Mr. Daigle has not demonstrated that these proceeds originated from him personally, and not a separate legal entity to which he had an interest in." This contention is supported by the Defendants' own responses to the Trustee's First Set of Interrogatories and Requests for Production, which the Trustee relies on in support of her Opposition to the Motion. Specifically, in response to Interrogatory 9, when asked to "state with specificity the source of the funds used to pay the [consideration for the Transfer]," the Defendants responded: "Funds which belonged to Mr. Daigle *and/or his two companies*, El Hat LLC and Medical Management Plus LLC." (emphasis added).

The record further contains no evidence demonstrating that these funds came directly from, or out of an account of Mr. Daigle, as opposed to a separate legal entity that he may have had an interest in. The checks alleged to demonstrate the consideration paid in exchange for the Transfer are drawn from an account of the law firm of Wisniowski & Sullivan, LLC and signed by Daigle's attorney, Timothy Sullivan. The source of these funds has not been established.

The Defendants have failed to satisfy their burden of demonstrating that they gave value for purposes of the Section 548(c) good faith defense. Because Section 548(c) requires that the transferee prove both that he gave value *and* took in good faith, the Court need not address the issue of the Defendants' good faith, as the Court's conclusion as to value precludes the protections afforded under this affirmative defense.[11] As such, and consistent with the Court's determination that the Trustee has set forth substantial evidence demonstrating genuine issues of

---

[11] The Defendants have nonetheless failed to raise any argument or advance any evidence as to their good faith in connection with the Transfer.

material fact as to the Debtor's actual intent to hinder, delay, or defraud creditors, summary judgment in favor of the Defendants as to Count I is hereby DENIED.

B.   Count II – Constructive Fraudulent Transfer

The Trustee's Complaint alternatively contends that the Transfer is avoidable as a constructively fraudulent transfer under 11 U.S.C. § 548(a)(1)(B), which permits a trustee to avoid transfers made by the Debtor where: (1) the Debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation" and (2) when the Debtor was either "insolvent on the date that such transfer was made . . . or became insolvent as a result of such transfer"; "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital"; or when the Debtor intended to incur, or believed he would incur, debts beyond his ability to pay them as such debts matured. 11 U.S.C. § 548(a)(1)(B).

In contrast to the Trustee's claim for actual fraudulent conveyance, her claim of constructive fraudulent conveyance is "based on the transferor's financial condition and the sufficiency of the consideration provided by the transferee, not on fraud." *In re Verestar, Inc.*, 343 B.R. 444, 460 (Bankr. S.D.N.Y. 2006) (citation omitted). Therefore, to prevail on her constructive fraudulent conveyance claim, the Trustee must establish that the Debtor was insolvent when the Transfer was made or was rendered insolvent by the Transfer *and* that the Debtor received less than equivalent value in exchange for the Transfer. 11 U.S.C. §§ 548(a)(1)(B)(i) and (ii). The burden remains on the Defendants, however, to first demonstrate that there is no genuine issue of material fact by pointing to an absence of evidence on the Trustee's part.

a.   Insolvency of the Debtor

Under the Bankruptcy Code, "insolvency" is defined as the "financial condition such that the sum of [an] entity's debts is greater than all of [the] entity's property, at fair valuation. . . ." 11 U.S.C. § 101(32). Courts in the Second Circuit apply the "balance sheet test" when assessing a debtor's insolvency. *In re People's Power and Gas, LLC,* 608 B.R. 333, 338 (Bankr. D. Conn. 2019). This test requires a determination of whether the Debtor was insolvent on the date of the Transfer, which in turn, involves comparing the fair value of the Debtor's assets at the time of the Transfer to the liabilities on the same date. *Universal Church v. Geltzer*, 463 F.3d 218, 226 (2d Cir. 2006).

The Court's insolvency calculation should also include the Debtor's contingent claims, including any pending lawsuits. *In re Turner & Cook, Inc.*, 507 B.R. 101, 109 (Bankr. D. Vt. 2014) (citations omitted). "When a liability was contingent at the time of the challenged transfers but is reduced to judgment before the court's insolvency determination, however, a court may permissibly use the judgment amount in valuing the contingent liability at the time of the transfers." *Id.* (citations omitted).

The Defendants argue that the Trustee cannot prove the Debtor's insolvency because, "at minimum, the Debtor possessed $518,875.64 [in insurance proceeds] within two years prior to his bankruptcy filing. . . . [and that it] is inconceivable that the Debtor rapidly spent that much money with absolutely nothing to show for it; therefore it is reasonably inferred that the Debtor has access to it."[12] This conclusory contention cannot, however, be reconciled with other allegations made in the Defendants Motion and supported by Daigle's own affidavit. Specifically, in his Affidavit Daigle contends that "the [D]ebtor received all of the insurance

---

[12] On his Schedules, however, the Debtor responded "No" to whether he received "any other income during this year or the *two previous calendar years*."  (emphasis added).

proceeds" but then states that the Debtor "never paid the mortgage off with those insurance proceeds and proceeded to spend all of that money elsewhere." Further, the Defendants state that the insurance proceeds' "whereabouts are unknown and have not been explained at all." In one breath the Defendants argue that the Debtor "has access" to assets in excess of half of a million dollars, and in the other, they claim that the Debtor "spen[t] all of that money" and that "its whereabouts are unknown and have not been explained."

What's more, notwithstanding this conflicting claim that the Debtor had at least $518,875.64 at the time of the Transfer (a claim that also ostensibly conflicts with a statement in the Debtor's schedules), the Defendants' position in the Motion is that the Debtor made the Transfer  "[k]nowing he could not afford to retain the Property" and that the Transfer was a "transaction in which [the Debtor] intended to sell a property he could not afford to pay the substantial debts owed on it and owed to Daigle."

The alleged debts on the Property—as evidenced in the closing documents, the Transfer Agreement, and the Debtor's Statement of Financial Affairs submitted by the Defendants—total $163,501.76. Adding the $178,046.49 State Court Judgment into the liability calculation, as is appropriate in this analysis, s*ee In re Turner & Cook, Inc.*, 507 B.R. at 109, the record evidences total liabilities of $341,548.25 at the time of the Transfer. Adding Daigle's alleged debt of $475,000 to this calculation brings that total to $816,548.25 in liabilities at and around the time of the Transfer.

As for his assets, the Debtor (and Daigle) valued the Property at $325,000. On the one hand, the Defendants claim that the Debtor had, in addition to the Property, an additional $518,875.64 in insurance proceeds, which would result in assets totaling $843,875.64—a scenario that would render the Debtor solvent at the time of the Transfer for purposes of the

balance sheet test and Section 101(32). But on the other hand, the Defendants also claim that the Debtor spent "all of that money" on unknown things, and that its whereabout were not, in fact, with the Debtor, but "unknown." Under these circumstances, based upon the evidence in the record, the Debtor's assets would consist only of the Property valued at $325,000—a scenario rendering the Debtor insolvent.

When construing these facts and drawing all reasonable inferences therefrom in the favor of the Trustee, the Court concludes that the Defendants, through these conflicting contentions, have established, in contravention of their burden as the movant on summary judgment, that there *is* a genuine issue of material fact as to the Debtor's solvency at the time of the Transfer.

      b.   Reasonably Equivalent Value

The Trustee "may not avoid a transfer solely because the debtor was insolvent at the time of the transfer or solely because the debtor made a transfer for less than reasonably equivalent value; the trustee must demonstrate *both* insolvency and lack of reasonably equivalent value." *In re People's Power and Gas, LLC,* 608 B.R. at 338 (emphasis in original). Because this Court has found a genuine and triable dispute as to the Debtor's insolvency at the time of the Transfer—a necessary element to the Trustee's constructive fraudulent conveyance claim—the Court need not address, at this juncture, whether the Transfer was also made for reasonably equivalent value.

The Court notes, however, that as previously discussed, the Trustee has demonstrated that there is a genuine issue of material fact as to the validity and amount of Daigle's alleged debt. This genuine dispute as to the validity of the alleged debt would also necessitate that this Court conclude that there is a genuine issue of material fact as to whether the Transfer was made for reasonably equivalent value, given that Daigle alleges that a portion of the consideration for the Transfer primarily consisted of this large outstanding alleged and *disputed* debt.

Accordingly, summary judgment in favor of the Defendants as to Count II of the Trustee's Complaint is hereby DENIED.

C.   The Remaining Counts of the Trustee's Complaint

Count III of the Trustee's Complaint seeks to invalidate the transfer from Daigle to 376 NM pursuant to 11 U.S.C. § 550(a)(2). Under Section 550(a), the Trustee may seek recovery of the Transfer *if* it was "avoided under Section 544, 545, 547, 548, 549, 553(b), or 724(a). . . ." 11 U.S.C. § 550(a). Only if the Transfer is avoided may the Trustee "pursue the actual recovery of the [T]ransfer from the initial transferee or the entity for whose benefit such transfer was made, or an immediate or mediate transferee." *In re Allou Distributors, Inc.*, 379 B.R. 5, 19 (Bankr. E.D.N.Y. 2007) (citing 11 U.S.C. § 550(a)(1)). Accordingly, the Court hereby DENIES summary judgment in favor of the Defendants as to Count III because there remains genuine issues of material fact as to whether the Transfer can first be avoided under 11 U.S.C. § 548, and thus, whether it can be subsequently recovered, as either an intentional or constructive fraudulent transfer.

Count IV of the Trustee's Complaint seeks recovery for Unjust Enrichment. "A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another. . . . With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard. . . . Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy. . . . Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the

defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." *In re Hampton Ventures, LLC,* 599 B.R. 474, 487–88 (Bankr. D. Conn. 2019) (quoting *Town of New Hartford v. Conn. Res. Recovery Auth.*, 291 Conn. 433, 451–52 (2009)).

"Although unjust enrichment typically arises from a plaintiff's direct transfer of benefits to a defendant, it also may be indirect, involving, for example, a transfer of a benefit from a third party to a defendant when the plaintiff has a superior equitable entitlement to that benefit. . . . If a payment to [a] defendant is an asset to which the claimant (as against defendant) has the paramount entitlement, the law of restitution and unjust enrichment supplies a claim to recover the amount in dispute." *Town of New Hartford*, 291 Conn. at 468.

The Trustee's claim for unjust enrichment will turn on whether the Defendants "unjustly did not pay . . . for the benefits" of the Transfer, *i.e.*, whether they did or did not provide reasonably equivalent value to the Debtor in exchange for the Transfer. Because there is a genuine issue for trial as to whether the Defendants did, in fact, provide reasonably equivalent value, a determination as to whether the Defendants were unjustly enriched cannot be reached until the Court has decided that issue. Accordingly, summary judgment in favor of the Defendants as to Count IV must be DENIED.

Count V of the Trustee's Complaint seeks a turnover order for the Debtor's equitable interest in the Transfer as an asset of this bankruptcy estate pursuant to 11 U.S.C. § 542. However, "property that has been fraudulently or preferentially transferred does not become property of the estate until it has been recovered." *In re Teligent, Inc.*, 325 B.R. 134, 137 (Bankr. S.D.N.Y. 2005); *see also* 11 U.S.C. § 541(a)(3) (property of the estate includes "[a]ny interest in property that the trustee recovers under section . . . 550"). Because there remains genuine issues

of material facts as to whether the Transfer can be avoided under 11 U.S.C. § 548 in Count III above, before any ruling enters on that issue, there also remains genuine issues of material facts as to whether the Trustee may recover the Transfer under Section 550. Accordingly, summary judgment in favor of the Defendants as to Count V must also be DENIED.

VI.    CONCLUSION

The Trustee has met her responsive burden on the Defendants' Summary Judgment Motion by presenting sufficient evidence to this Court demonstrating that there are genuine issues of material facts to be addressed at trial as to: (1) whether the Debtor made the Transfer with the actual intent to hinder, delay, or defraud his creditors; (2) as to the validity and amount of Daigle's alleged debt; (3) whether the Transfer was made for reasonably equivalent value; (4) whether the Transfer can be avoided; (5) whether the Defendants were unjustly enriched; and (6) whether the Trustee may recover the Transfer for the benefit of the Debtor's bankruptcy estate. Additionally, the Defendants have failed to satisfy their burden in demonstrating that there is *not* a genuine issue of material fact for trial with respect to the Debtor's solvency at the time of the Transfer. Accordingly, it is hereby:

ORDERED: That Summary Judgment in favor of the Defendants as to Counts I–V of the Trustee's Complaint is hereby DENIED; it is further

ORDERED: That the Trustee's Objection is hereby SUSTAINED; and it is further

ORDERED: The Court will hold a Pre-Trial Status Conference on September 15, 2022, at 11:00 AM. In anticipation thereof, the parties are directed to confer on the drafting and submission of a proposed final Pre-Trial Order to be filed on or before August 31, 2022.

IT IS SO ORDERED at Hartford, Connecticut this 12th day of August 2022.

*James J. Tancredi*
United States Bankruptcy Judge
District of Connecticut